**F I L E D**

**PUBLISH**

**July 27, 2005**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JOHN ALBERT BOLTZ,

        Petitioner - Appellant,

    v.

MIKE MULLIN, Warden, Oklahoma
State Penitentiary,

        Respondent - Appellee.

No. 04-6134

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D. Ct. No. CIV-99-156-M)**

---

James L. Hankins, The Coyle Law Firm, Oklahoma City, Oklahoma, appearing for
Appellant.

Preston Saul Draper, Assistant Attorney General (W.A. Drew Edmondson,
Attorney General, with him on the brief), Office of the Attorney General for the
State of Oklahoma, Oklahoma City, Oklahoma, appearing for Appellee.

---

Before **TACHA**, Chief Circuit Judge, **O'BRIEN**, and **TYMKOVICH**, Circuit
Judges.

---

**TACHA**, Chief Circuit Judge.

---

A jury convicted Petitioner-Appellant John Albert Boltz of first-degree

murder in the stabbing and decapitation death of his stepson, Doug Kirby, and sentenced him to death in 1984. In 1991, the Oklahoma Court of Criminal Appeals ("OCCA") affirmed his conviction and sentence on direct appeal. Mr. Boltz then filed an application for post-conviction relief in the District Court of Pottawatomie County, Oklahoma on July 2, 1992, which was denied and subsequently affirmed by the OCCA. On September 9, 1999, Mr. Boltz filed a petition for a writ of habeas corpus in the United States District Court for the Western District of Oklahoma pursuant to 28 U.S.C. § 2254. Relief was denied on all grounds on March 25, 2004. Mr. Boltz then sought a certificate of appealability ("COA") with the District Court, which granted the certificate as to Mr. Boltz's claim of ineffective assistance of counsel. This Court also granted a COA with respect to two other claims raised by Mr. Boltz: that the evidence was insufficient to establish the "continuing threat" aggravating factor found by the jury, and that his right to due process was violated when the court failed to instruct the jury on heat of passion manslaughter. We take jurisdiction under 28 U.S.C. §§ 1291 and 2253 and AFFIRM.

## I. BACKGROUND

On April 18, 1984, Pat Kirby, who was then married to Mr. Boltz, left work in Shawnee, Oklahoma and drove to Stroud to meet her friend and former boss, Duane Morrison. Mr. Boltz was suspicious that his wife was having an

affair with Mr. Morrison and followed her there dressed in combat fatigues and dark glasses. When he saw that Ms. Kirby was meeting Mr. Morrison, he flew into a rage, swearing at Mr. Morrison and telling him that he was going to cut his head off. Mr. Boltz then exclaimed that he had killed men, women, and children during the Korean War and killing "didn't faze him," and that he had cut off people's heads in the war for less serious infractions.

After this altercation, Ms. Kirby returned alone to the trailer home she and Mr. Boltz shared in Shawnee. There, she wrote a note to her husband telling him that their marriage was over. She then packed some clothes, called her twenty-two-year-old son, Doug Kirby, to ask for help moving some of her things into his home, and went to her mother's house.

During this time, Mr. Boltz was drinking at the VFW hall. When he returned to the trailer, he found the note and drove to his mother-in-law's home to see if his wife was there. Once there, he forced his way in and yelled and swore at Ms. Kirby. Ms. Kirby then called the Shawnee Police Department and asked them to remove Mr. Boltz from the premises. Mr. Boltz left shortly thereafter, and Ms. Kirby went to her son's house.

Mr. Boltz, who had returned to his trailer, then made the first of three phone calls to Doug Kirby's residence. In the first, Mr. Kirby answered the phone and spoke with Mr. Boltz for a few minutes. A few minutes later, Mr.

Boltz placed the second call. Again, Mr. Kirby answered and had a very short conversation with Mr. Boltz. After these two calls, Mr. Kirby did not appear upset, but he told his mother that he was going over to Mr. Boltz's trailer to speak with him. After he left, Mr. Boltz called Mr. Kirby's residence a third time. This time, Ms. Kirby answered. Mr. Boltz told her that he was "going to cut [her] loving little boy's head off." He also said that he was going to kill Ms. Kirby herself within the hour.

After hanging up with her husband, Ms. Kirby placed another call to the Shawnee Police Department. This phone call was recorded and played to the jury during the State's case-in-chief:

| DISPATCHER: | Shawnee Police Department, Cheryl. |
| MS. KIRBY: | Cheryl, this is Pat again. I hate—I hate to keep calling, but John just now called and said he was going to cut my son's head off, and my son is over there in the trailer park, and John is over there at the trailer. That was Lot 119. |

Ms. Kirby then drove to Mr. Boltz's trailer searching for her son. When she arrived, she found her son's body laying outside his car. He had suffered eight stab wounds to the neck, chest and abdomen, and his neck had been cut three times. His neck was injured so severely that both carotid arteries had been severed, the voice box and esophagus were cut, and the spinal column was damaged. One of the stab wounds pierced through his back. Blood stains were

-4-

discovered leading from the front porch to the driver's side door of Mr. Kirby's car as well as inside the vehicle. A .22 caliber revolver was recovered from the passenger seat; the gun had no blood on it although the seat was splattered with blood.

After the killing, Mr. Boltz drove to the American Legion in Midwest City, where he told some friends that he had killed Mr. Kirby and that he had "probably cut his head off." The police were called and Mr. Boltz was arrested without incident. Thereafter, he confessed to the killing but did not elaborate on the circumstances leading up to it.

Mr. Boltz was charged with first-degree murder. After refusing to plead guilty to voluntary manslaughter, Mr. Boltz went to trial. At trial, Mr. Boltz did not dispute the State's contention that he stabbed Mr. Kirby to death. Rather, his strategy was to present a self-defense theory. He testified that Mr. Kirby had called him that evening and threatened to kill him. Mr. Boltz claimed that when Mr. Kirby arrived at his trailer, he kicked in the front door and as he went for a gun, Mr. Boltz stabbed him twice, but did not remember anything after that point. The jury convicted Mr. Boltz of first-degree murder.

During the penalty phase, the State contended that two aggravating circumstances—that the crime was especially heinous, atrocious or cruel, and that Mr. Boltz constituted a continuing criminal threat to society—warranted a

sentence of death. In his defense, Mr. Boltz argued that he had no prior criminal record and referenced the testimony of three character witnesses who had testified on his behalf in the guilt phase. The jury imposed the death penalty.

Over the course of several years, Mr. Boltz filed a direct appeal, an application for state post-conviction relief, and a federal petition for habeas relief under 28 U.S.C. § 2254, all of which were denied. Most recently, the District Court rendered an exhaustive eighty-page opinion thoroughly reviewing each of Mr. Boltz's habeas claims. He now timely appeals the District Court's denial of his federal habeas petition on the three grounds for which a COA has been issued. *See* 28 U.S.C. § 2253(c). Mr. Boltz argues on appeal: (1) that he received ineffective assistance of counsel; (2) that the evidence was insufficient to support the continuing threat aggravating circumstance; and (3) that the jury should have been instructed on heat of passion voluntary manslaughter.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

A.      Standard of Review

Mr. Boltz first argued to the OCCA in his direct appeal that his trial counsel, Duane Miller, had been ineffective; the OCCA, however, refused Mr. Boltz's request for an evidentiary hearing on the matter and dismissed Mr. Boltz's claim. Mr. Boltz similarly requested permission to conduct discovery in his application for post-conviction relief filed in the District Court of Pottawatomie

County, Oklahoma, which was also denied and then affirmed by the OCCA. The United States District Court for the Western District of Oklahoma subsequently held its own evidentiary hearing, *see* § 2254(e)(2), while reviewing Mr. Boltz's § 2254 petition and thereafter refused to grant relief.[1]

Because the OCCA made no substantive determination on Mr. Boltz's ineffective assistance claim, this Court does not apply the deferential standard of review mandated by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See* 28 U.S.C. § 2254(d); *Bryan v. Mullin*, 335 F.3d 1207, 1215-16 (10th Cir. 2003). Instead, we review the District Court's determination under the standard laid out in *Miller v. Champion*, 161 F.3d 1249, 1254 (10th Cir. 1998). In *Miller*, we stated that

> [I]neffective assistance claim[s] present[ ] a mixed question of law and fact. Because our analysis of this claim primarily involves consideration of legal principles, we review this claim de novo. Further, we note that because the state court did not hold any evidentiary hearing, we are in the same position to evaluate the factual record as it was. Accordingly, to the extent the state court's dismissal of [petitioner's ineffective assistance claim] was based on its own factual findings, we need not afford those findings any deference.

*Miller*, 161 F.3d at 1254 (internal citations omitted). In other words, this Court

---

[1] Neither Mr. Boltz nor the respondent question the propriety of the District Court's decision to hold an evidentiary hearing regarding Mr. Boltz's claim of ineffective assistance of counsel; therefore, we do not address that question and will assume the District Court's decision was appropriate. As a result, we will not address the standard preliminary issues of exhaustion and procedural bar.

accepts the District Court's factual findings so long as they are not clearly erroneous and reviews de novo whether Mr. Miller's assistance was ineffective as a matter of law. *See Bryan*, 335 F.3d at 1216.

B.    Merits

Claims of ineffective assistance of counsel are reviewed under the standard originally set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). That standard requires Mr. Boltz to make two separate showings. "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. To establish deficiency, a "defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. This is a heavy burden, as we presume that counsel's actions constituted sound strategy. *Id.* at 689.

"Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. To establish prejudice, Mr. Boltz must demonstrate there is a "reasonable probability" that, but for counsel's errors, the result of the trial would have been different. *Id.* at 694. When deficiencies occur during the

sentencing stage in a capital case, the more focused inquiry is "whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." *Id.* at 695. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. We review the totality of the evidence, including all evidence presented by the State, in determining whether there is prejudice. *Id.* at 695. Finally, "[t]his Court may address the performance and prejudice components in any order, but need not address both if [petitioner] fails to make a sufficient showing of one." *Cooks v. Ward*, 165 F.3d 1283, 1292–93 (10th Cir. 1998).

In his § 2254 petition before the District Court, Mr. Boltz pointed to seventeen instances of Mr. Miller's alleged ineffectiveness during both the guilt and sentencing phases of trial. The District Court applied *Strickland* and determined in each instance that Mr. Miller's performance was not deficient, was not prejudicial, or was neither deficient nor prejudicial. On appeal, Mr. Boltz contests the District Court's conclusions as to fourteen of the seventeen instances. We agree with the District Court that none of Mr. Miller's acts rise to the level necessary to justify granting Mr. Boltz's habeas petition under *Strickland*.

1. *Counsel's Illness During Trial*

Mr. Boltz first contends that Mr. Miller was physically ill on the day of Mr. Boltz's trial and that this illness rendered him ineffective. We agree with the District Court that the record indicates Mr. Miller was sick that day. Indeed, Mr. Miller testified in the evidentiary hearing before the District Court that he felt as though he had the flu and had trouble breathing, which interfered with his concentration. Mr. Boltz does not argue, however, that Mr. Miller's illness, standing alone, entitles him to relief. Instead, Mr. Boltz simply contends that it should be considered during the review of his specific claims of ineffective assistance of counsel. This Court has done so.

2. *Inadequate Pretrial Investigation*

Mr. Boltz also argues that Mr. Miller's assistant in preparing the defense, Michael Esche, was not qualified. Mr. Boltz points out that Mr. Esche was not a licensed investigator, only attended college for a short time, and was hired by Mr. Miller as a favor to a family friend. Like his argument concerning Mr. Miller's illness, Mr. Boltz does not argue that Mr. Miller's reliance on Mr. Esche in and of itself entitles him to habeas relief. We also note that the record makes clear that Mr. Esche acted only at the direction of Mr. Miller. Therefore, we consider Mr. Boltz's argument concerning Mr. Esche's investigation and qualifications in the context of Mr. Boltz's specific claims that Mr. Miller failed to investigate

particular issues, which we address below.

3. *Calling Ralph Robertson as a Witness*

Mr. Boltz's first specific claim of ineffective assistance is that Mr. Miller should not have called Ralph Robertson to testify. Mr. Robertson was a friend of Mr. Boltz's and claimed to be a criminal investigator. As the defense's first witness, he testified that he went to Mr. Boltz's trailer the day after the killing to investigate the scene on behalf of his friend and found a book with a bullet hole through it in the trailer. He also found a bullet slug near the book which was admitted into evidence. The implication of Mr. Robertson's testimony was that Mr. Kirby had fired a gun at Mr. Boltz, which tended to bolster Mr. Boltz's claim that he was acting in self-defense.

On cross-examination, however, Mr. Robertson testified that he was not a ballistics expert and had not compared the slug he claimed to have found with the bullets from the gun in Mr. Kirby's car. Moreover, the state later called the lead investigator in the case to the stand. He testified that he had test-fired the gun found in Mr. Kirby's car and examined the slug Mr. Robertson allegedly found; he stated that the bullets were clearly not the same. In his § 2254 petition, Mr. Boltz claims that Mr. Miller's decision to call Mr. Robertson as a witness constituted deficient performance and that this error effectively destroyed the credibility of the defense from the outset of the trial. The District Court did not

-11-

decide whether Mr. Miller's conduct constituted deficient performance. Instead, it held that Mr. Boltz had failed to demonstrate prejudice from any error. We agree.

We first note that Mr. Boltz insisted that Mr. Robertson testify. Moreover, when we consider the overwhelming evidence against Mr. Boltz—including Mr. Boltz's confrontation with his wife and Mr. Morrison earlier on the day of the killing, Mr. Boltz's statement to Mr. Morrison that he had cut off heads in the war and had not been afraid to do so, his finding the note from Ms. Kirby saying the marriage was over, his subsequent threat to Ms. Kirby that evening that he was going to cut off her son's head, the recorded phone call played to the jury in which Ms. Kirby told the police about that threat, and the fact that Mr. Boltz admitted to stabbing Mr. Kirby a short time later—we cannot say that there is a reasonable probability that had Mr. Robertson not testified, the jury would have found Mr. Boltz not guilty of first-degree murder.

4.      *Failure to Demonstrate that Mr. Boltz Did Not Plant the Gun Found in Mr. Kirby's Car*

At trial, the State contended that Mr. Boltz planted the .22 caliber pistol found in Mr. Kirby's car in order to claim self-defense. Eyewitness Vita Witt, who was in a home nearby looking out the window during the killing, corroborated the State's theory by testifying at trial that she saw Mr. Boltz put the gun in Mr. Kirby's car. In his § 2254 petition, Mr. Boltz argues that Mr.

-12-

Miller should have ordered the transcript of the preliminary hearing because had he done so, he would have realized that Ms. Witt testified in that hearing that Mr. Boltz did not put the gun in the car and could have impeached her testimony at trial. The District Court determined that Mr. Miller was deficient in not ordering the transcript but held there was no prejudice. We agree.

Mr. Boltz's only argument that he was prejudiced by Mr. Miller's failure to order the transcript is that had Mr. Miller ordered the transcript, he would have elicited testimony from Ms. Witt that Mr. Boltz did not plant the gun. This contention, however, fails to address the prejudice component as defined by *Strickland*—namely, that but for counsel's error, there is a reasonable probability that the jury would have returned a different verdict. We seriously question whether impeaching Ms. Witt on this point would have led the jury to conclude that Mr. Boltz did not plant the gun because the State introduced photographs showing that the gun had no blood on it even though it was resting on the car seat atop of a pool of blood—evidence that strongly supports the State's theory that someone put the weapon in the car after the killing. Moreover, impeaching Ms. Witt's testimony that she saw Mr. Boltz plant the gun could not have reasonably undermined the evidence of premeditation—namely, Mr. Boltz's statement to Ms. Kirby that he was going to cut off Mr. Kirby's head just minutes before he nearly did so—that was obviously crucial to the jury's verdict of first-

degree murder. Finally, given that Ms. Witt also testified she saw Mr. Boltz astride Mr. Kirby—whom she described as looking as motionless as a "rag doll"—stabbing him repeatedly while calling him a "son of a bitch" and smiling when he finished, we conclude that Mr. Boltz was not prejudiced by Mr. Miller's error in not ordering the transcript from the preliminary hearing so that he could have impeached Ms. Witt's statement that she saw Mr. Boltz plant the .22 pistol in Mr. Kirby's car.

5.    *Failure to Introduce Evidence of Bruises on Mr. Boltz's Arm*

During his opening statement, Mr. Miller promised the jury that the defense would present evidence that Mr. Kirby, while initiating a life-threatening attack, grabbed Mr. Boltz by the arm and bruised him. Mr. Miller did not put on any such evidence, forgetting to ask Mr. Boltz and witnesses Mr. Robertson and Mr. Thompson about it. The District Court concluded that this constituted deficient representation. Nonetheless, it held that Mr. Boltz was not prejudiced.

Again, we agree that Mr. Boltz has failed to demonstrate that there is a reasonable probability that the jury would have returned any other verdict if Mr. Miller had put on evidence of the bruises. With respect to the second prong of the *Strickland* test, Mr. Boltz argues only that Mr. Miller "made promises to the jury and then failed to deliver" and that "this allowed the State to further impugn the integrity of the defense through yet more rebuttal witnesses." While we agree

that the omitted evidence could tend to corroborate Mr. Boltz's version of events, given the overwhelming evidence of premeditation, Mr. Boltz has not demonstrated a reasonable probability that, but for Mr. Miller's failure to introduce such evidence, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

      6.     *Failure to Present Evidence of Mr. Kirby's Glasses*

Mr. Kirby's glasses were found in the front passenger seat of his car, and Mr. Boltz argues that Mr. Miller should have pointed this out to the jury. He maintains that there was testimony at trial that Mr. Kirby drove his car to a "screeching halt" in front of Mr. Boltz's trailer, and that evidence of Mr. Kirby leaving his prescription glasses in the passenger seat further demonstrates that he got out of the car intending to confront Mr. Boltz physically. The District Court concluded that Mr. Miller's failure to introduce this evidence did not meet either prong of the *Strickland* test. We agree that trial counsel was not deficient in this regard.

Evidence at trial established that Mr. Kirby often did not wear his glasses. Indeed, Mr. Kirby's ex-wife testified that he did not wear them every day. Mr. Kirby's brother also testified that Mr. Kirby did not wear his glasses often and that they may simply have been reading glasses. Moreover, as Mr. Miller put it, "[t]he fact that the glasses were out in the car didn't prove . . . whether that made

him the aggressor or not." Indeed, as the State contends, the jury could just as easily have inferred that the glasses, which were not folded closed and were splattered with blood, fell off Mr. Kirby's head during the attack by Mr. Boltz. Given these circumstances, failing to raise the issue of the glasses falls within the realm of strategic choice. *See Strickland*, 466 U.S. at 689.

7. *Failure to Present Evidence that Mr. Kirby Knew Mr. Boltz Had Accused Ms. Kirby of Adultery*

Ms. Kirby testified at trial that her son knew nothing about her marital problems with Mr. Boltz. In support of his petition for habeas relief, Mr. Boltz argues that Mr. Miller should have impeached Ms. Kirby's trial testimony with her preliminary hearing testimony. According to Mr. Boltz, Mr. Miller's failure to demonstrate that Mr. Kirby knew that Mr. Boltz had accused his wife of having an affair left the jury without a reason why Mr. Kirby would want to kill Mr. Boltz.

We agree with the District Court that Mr. Miller's failure to impeach Ms. Kirby on this point did not prejudice him. Even if the jury believed that Mr. Kirby was angry with Mr. Boltz for accusing his mother of adultery and drove to Mr. Boltz's home to confront him about it, the fact remains that after Mr. Boltz informed Mr. Kirby of the alleged affair, Mr. Boltz phoned Ms. Kirby and told her he was going to cut off Mr. Kirby's head. That is to say, this impeachment simply does not speak to the issue of premeditation, on which the State presented

overwhelming evidence. Hence, there is no reasonable probability that the jury would have returned a different verdict had Mr. Miller impeached Ms. Kirby on this issue.

8.      *Failure to Investigate Mr. Kirby's Violent Nature*

Mr. Boltz next argues that Mr. Miller failed to investigate Mr. Kirby's propensity for violence but nonetheless attempted to show that Mr. Kirby was a violent person at trial; this, Mr. Boltz contends, only opened the door for the State to present evidence of Mr. Kirby's peacefulness. Further, Mr. Boltz argues, because Mr. Miller had not investigated Mr. Kirby's propensity for violence, Mr. Miller had no evidence to rebut the State's evidence of Mr. Kirby's peaceful nature.

Mr. Boltz fails to satisfy the second prong of the *Strickland* test. First, as the District Court exhaustively details, the potential testimony from witnesses who would have testified that Mr. Kirby had a violent nature is far from ideal. Moreover, we simply cannot conclude that had Mr. Miller investigated Mr. Kirby's propensity for violence and presented such evidence to the jury, the jury would have returned a different verdict given the overwhelming evidence of premeditation in this case.

9.      *Failure to Present Evidence that Mr. Kirby Attacked Mr. Boltz Inside the Trailer*

The State's theory of the case was that Mr. Boltz phoned Mr. Kirby and

asked him to drive out to his trailer. When Mr. Kirby pulled up, the State contended, Mr. Boltz met him on his front porch and stabbed him with premeditation repeatedly as Mr. Kirby retreated toward his car. In accordance with this theory, the State told the jury that Mr. Kirby never stepped inside the trailer—and therefore was not the initial aggressor—and that the police found no blood stains inside the trailer. In his § 2254 petition, Mr. Boltz argues that Mr. Miller should have called three witnesses who would have rebutted the State's assertion that he essentially ambushed Mr. Kirby on the porch by testifying about blood spatter they saw inside the living room.

We agree with the OCCA, *Boltz*, 806 P.2d at 1126, and the District Court that Mr. Miller's actions were not deficient. First, as the District Court thoroughly illustrated, Mr. Boltz's proposed witnesses' testimony is not compelling. Second, photographs taken by investigators revealed no blood in the trailer. Third, Mr. Miller himself surveyed the scene the day after the killing and found no evidence of a struggle inside. Fourth, Ms. Witt, the eyewitness to the killing, testified that she saw Mr. Boltz standing over Mr. Kirby just outside his car—not on the porch—when Mr. Boltz was stabbing Mr. Kirby and cutting his throat. Finally, as Mr. Miller elaborated during his testimony at the habeas evidentiary hearing, given these circumstances whether Mr. Kirby entered the house or not was simply not relevant to Mr. Boltz's self-defense theory. As such,

-18-

we conclude that failure to present evidence of an indoor attack was a legitimate strategic choice. *See Strickland*, 466 U.S. at 689.

10.     *Failure to Call Mr. Morrison to Testify*

Mr. Boltz next argues that Mr. Miller should have called Mr. Morrison to testify about the circumstances that would have led a reasonable person in Mr. Boltz's position to believe Ms. Kirby was having an affair. He also argues that Mr. Morrison's testimony would have demonstrated that he did not feel threatened by Mr. Boltz's statement about cutting off heads in the war.

To begin, whether Mr. Boltz reasonably believed his wife was having an affair is not relevant to this case.[2] Therefore, Mr. Boltz has failed to show that Miller's decision not to call Mr. Morrison to the stand "fell below an objective standard of reasonableness" under the first prong of *Strickland*. *Strickland*, 466 U.S. at 688. As to his second argument, Mr. Boltz was not prejudiced by Mr. Miller's failure to call Mr. Morrison to the stand in order to testify that he did not perceive Mr. Boltz's statements as threats. The overwhelming evidence of premeditated murder in this case does not cause us to question the jury's verdict based on the absence of Mr. Morrison's testimony on this point.

---

[2]To the extent it could be argued that such evidence is relevant to Mr. Boltz's claim that the jury should have been instructed on heat of passion manslaughter, because we conclude below that the evidence did not support such an instruction, this argument does not warrant relief. *See infra* Part IV.

11.    *Deborah Gregg's Testimony Regarding Motive*

At trial, Deborah Gregg, an office deputy with the Pottawatomie County Sheriff's Office, testified that while she was booking Mr. Boltz into jail, she allowed him to make a telephone call and overheard him say to the recipient, "You damn right I killed him.  I'd do it again if I had to.  He took my life, he took my wife, my family, and he took my church."  Although there is some dispute between Mr. Boltz and the State as to whom Mr. Boltz called that night, the District Court determined on the basis of phone records that the call was placed to Earline Thompson, Mr. Boltz's ex-wife.  After a review of the record, we accept this factual determination because it is not clearly erroneous.  *See Bryan*, 335 F.3d at 1216.

In support of his petition for habeas relief, Mr. Boltz argues that Mr. Miller should have impeached Officer Gregg's testimony by calling Ms. Thompson to testify about the statement;[3] she apparently would have testified that Mr. Boltz never made the statement.[4]  Assuming Ms. Thompson would have

---

[3]Mr. Boltz also argues that the phone call might have been placed to Cedric James, and that Mr. James should also have been called to testify about the statement.  Because the District Court found that Mr. Boltz called Ms. Thompson only, this contention is without merit.

[4]At the evidentiary hearing held nearly eighteen years after Mr. Boltz's trial, Ms. Thompson testified that she does not remember ever hearing Mr. Boltz utter the words attributed to him by Officer Gregg; she also testified, however, that she does not remember receiving a phone call from Mr. Boltz from jail the

(continued...)

testified to this effect, Mr. Boltz has not shown how this testimony would have changed the outcome of the trial. Evidence that Mr. Boltz had seen Ms. Kirby and Mr. Morrison together the day of the killing and that Ms. Kirby wrote him a note telling him their marriage was over supplied the motive for murder to the same extent as Officer Gregg's unrebutted testimony; therefore, even if Ms. Thompson had testified that Mr. Boltz never made the statement attributed to him by Officer Gregg, we are confident the jury would have still returned a guilty verdict of first-degree murder.

12.    *Failure to Pursue an Intoxication Defense*

"Voluntary intoxication can reduce homicide from murder in the first degree to manslaughter in the first degree, provided it rendered the defendant incapable of entertaining a necessary specific intent to effect death." *Brogie v. State*, 695 P.2d 538, 546 (Okla. Crim. App. 1985). Mr. Boltz claims to have ingested prescription medication with a large amount of alcohol the day of the killing and that Mr. Miller should have investigated this and brought it to the jury's attention. Mr. Boltz argues he was prejudiced by this alleged error because evidence of intoxication "makes a much more compelling case for either a defense to the crime or a lesser included offense."

---

[4](...continued)
night he was arrested.

Contrary to Mr. Boltz's assertion, he was not prejudiced by Mr. Miller's failure to develop an intoxication defense because the jury would have returned the same verdict even had such evidence been before it. "When voluntary intoxication is relied upon as an affirmative defense, the defendant must introduce sufficient evidence to raise a reasonable doubt as to his ability to form the requisite criminal intent." *Brogie*, 695 P.2d at 546. As the District Court reasoned, however, Mr. Boltz "cannot escape the fact the jury was informed he had stated to Pat Kirby shortly before the murder that he was going to cut off her son's head. Shortly thereafter, in addition to other multiple stab wounds, [Mr. Boltz] nearly decapitated the victim with his knife." In other words, the evidence clearly shows Mr. Boltz had formed the specific intent to kill Mr. Kirby; indeed, he informed his wife of that intention. Because testimony that Mr. Boltz had been drinking heavily while on prescription drugs earlier in the day would in no way call that evidence into question, habeas relief on this ground is denied.

13.     *Failure to Rebut the Burglary Allegation*

During the penalty phase of the trial, the State offered evidence that Mr. Boltz broke into Mr. Kirby's home looking for Ms. Kirby after killing her son but before going to the American Legion, in order to establish the aggravating circumstance that there was a probability Mr. Boltz would commit criminal acts of violence constituting a continuing threat to society. *See* Okla. Stat. Ann. tit.

-22-

21, § 701.12(7). Specifically, the State put on testimony that the morning after Mr. Kirby's death, police discovered the door to his home splintered as a result of forcible entry. Although nothing was missing, a picture on the floor was shattered. Mr. Boltz argues that Mr. Miller was ineffective because he did not rebut the State's allegation by putting on evidence that it would have been impossible for Mr. Boltz to have committed the burglary and still arrive at the American Legion when he did.

Assuming Mr. Miller should have pursued this line of attack—which, given the testimony of Officer Moody and the other witnesses at the American Legion Hall, is a dubious assumption at best—we are not convinced that the burglary was essential to the jury's finding of the continuing threat aggravating circumstance. Ms. Kirby testified that after Mr. Boltz told her he was going to kill her son, he told her that he would also kill her. Mr. Boltz subsequently carried through on the first threat. Even if the jury did not believe that Mr. Boltz broke in to Mr. Kirby's home looking for Ms. Kirby the night of the killing, the fact remains that Mr. Boltz threatened Ms. Kirby's life shortly before he killed her son. As the State stated during the penalty phase, "the Defendant appears to harbor extreme ill will towards the mother of the victim, and . . . she is still alive." Therefore, in light of that evidence, we are unpersuaded that had Mr. Miller demonstrated that Mr. Boltz did not burglarize Mr. Kirby's residence, the

jury might have found that Mr. Boltz was not a continuing threat to society.

14. *Penalty Phase Mitigation Witnesses*

Mr. Boltz's final contention with respect to his ineffective assistance claim is that Mr. Miller should have conducted a proper investigation of possible mitigation witnesses and then called such witnesses to testify during the penalty phase.

To begin, we note that Mr. Miller made a record at trial that Mr. Boltz did not want him to present mitigation witnesses:

> MR. MILLER: I want the record to show that Mr. Boltz has advised me that he does not wish to present any additional evidence to this jury during the punishment stage, with the exception of a stipulation that the District Attorney and the defense are entering into; and that stipulation being, that Mr. Boltz has no prior criminal record, which is not to say that we aren't going to present argument, and that sort of thing. But we intend to offer no other evidence.
>
> And that's your—your instructions to me; is that correct? Would you say "Yes"—
>
> MR. BOLTZ: Yes.
>
> . . .
>
> THE COURT: All right.

Trial Tr. at 687–88.

Instead, Mr. Miller incorporated the testimony of four character witnesses who appeared in the guilt phase of the trial. Moreover, Mr. Miller testified at the evidentiary hearing that he conducted an investigation into possible mitigation

-24-

evidence, but ultimately did not call witnesses—including members of Mr. Boltz's church—in part because they either did not know Mr. Boltz well, were unwilling to testify, or had criminal records or other problems that would undermine their efficacy as a mitigation witness. Indeed, Mr. Miller testified that his investigation produced "very few people that would be willing to offer any kind of evidence in mitigation for Mr. Boltz."

Mr. Boltz argues, however, that had Mr. Miller conducted an adequate investigation, he would have discovered many helpful witnesses. The District Court examined the proffered testimony of these witnesses during the evidentiary hearing and concluded that they would have testified in the same manner as the character witnesses in the guilt phase of the trial—namely, "that [Mr. Boltz] was a good guy, honest and likable"—and that, given the nature of the crime, there was not a possibility that their cumulative testimony would have altered the jury's decision to impose death.[5]

Upon a review of the record, we agree. The State presented two possible aggravating circumstances: that the killing was "especially heinous, atrocious or cruel," and that Mr. Boltz was a continuing threat to society. The fact that these

---

[5]Moreover, the District Court concluded, and we agree, that the value of some of the witness' testimony is debatable due to lengthy periods of time since they had last interacted with Mr. Boltz and due to the limited nature of their relationships.

witnesses considered Mr. Boltz to be a good person would not have supported the notion that the crime was not committed in a heinous, atrocious, or cruel manner. Additionally, the fact that Mr. Boltz threatened to kill Ms. Kirby shortly before he killed her son provides more than adequate support for finding the continuing threat aggravating circumstance, even if witnesses testified that Mr. Boltz was generally an upstanding citizen. Accordingly, habeas relief is denied as to this claim.

In sum, because we conclude that Mr. Miller's performance either was not deficient or not prejudicial, we conclude that his conduct did not rise to the level of ineffective assistance of counsel; therefore, habeas relief is not warranted.[6]

## III. INSUFFICIENT EVIDENCE TO PROVE THE "CONTINUING THREAT" AGGRAVATING CIRCUMSTANCE

A.     Standard of Review

Mr. Boltz next argues that he is entitled to habeas relief because the evidence was not sufficient to support the jury's finding of the aggravating circumstance that there was a probability he would commit criminal acts of violence constituting a continuing threat to society. *See* Okla. Stat. Ann. tit. 21, § 701.12(7). In contrast to Mr. Boltz's first claim for relief, the OCCA decided

---

[6] Mr. Boltz does not raise the issue of cumulative error. *See United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002). Nonetheless, we have reviewed the issue and conclude that it does not provide a basis for relief in this case.

this issue on the merits and rejected it. Therefore, under AEDPA, we review the OCCA's determination and may not issue a writ of habeas corpus unless that decision:

> (1) . . . was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2). In addition, we presume that the OCCA's factual determinations are correct, and Mr. Boltz has the burden to rebut that presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

Our case law is unclear whether a sufficiency of the evidence claim presents a question of law that is reviewed under § 2254(d)(1) or a question of fact reviewable under § 2254(d)(2). *See Turrentine v. Mullin*, 390 F.3d 1181, 1197 (10th Cir. 2004); *Hogan v. Gibson*, 197 F.3d 1297, 1306 (10th Cir.1999); *Moore v. Gibson*, 195 F.3d 1152, 1176 (10th Cir. 1999). Nonetheless, we need not decide this issue because the OCCA's determination is neither contrary to clearly established federal law nor based on an unreasonable determination of the facts.

B.     Merits

In this case, the OCCA concluded that evidence showing that Mr. Boltz lured Mr. Kirby to his trailer, called Ms. Kirby and told her he was going to kill

-27-

her son, told Ms. Kirby he would also kill her within the hour, entered Mr. Kirby's home looking for Ms. Kirby after he killed her son, and had bragged about killing before, combined with the sheer callousness in the manner the murder was committed, sufficiently supported the jury's finding of the continuing threat aggravator. *See Boltz*, 806 P.2d at 1125. Mr. Boltz does not argue that the OCCA's determination of these facts is unreasonable; therefore, we presume them to be correct. *See* 28 U.S.C. § 2254(e)(1). Hence, we find there is a clear basis for the OCCA's factual determinations; as such, habeas relief is not warranted under § 2254(d)(2). Therefore, we turn to Mr. Boltz's specific arguments and analyze whether the OCCA's upholding of the jury's finding is contrary to clearly established federal law.

1.  *Evidence*

First, Mr. Boltz contends that the introduction of an unadjudicated offense—namely, the burglary of Ms. Kirby's home—during the sentencing phase in a capital case is a violation of due process; he argues that due process is satisfied only when there is sufficient "indicia of reliability" supporting the claim that the defendant committed the offense. He argues that no such indicia of reliability exist here, pointing out that his appellate counsel's investigator drove the route between Mr. Boltz's trailer, Mr. Kirby's house, and the American Legion, and concluded that it would have been impossible for Mr. Boltz to have

committed the burglary in the time frame alleged by the State.

The Supreme Court has emphasized the "'need for reliability in the determination that death is the appropriate punishment in a specific case.'" *Caldwell v. Mississippi*, 472 U.S. 320, 340 (1985) (vacating sentence where prosecution misled jury into believing that responsibility for determining the appropriateness of a death sentence lies with the appellate court which will review the jury's decision, rather than with the jury itself) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion)). Nonetheless, the Supreme Court itself has never indicated, as is required for Mr. Boltz to obtain relief, *see Williams v. Taylor*, 529 U.S. 362, 411 (2000), that only those unadjudicated offenses which are supported by sufficiently reliable evidence may be introduced in the sentencing phase of a capital case. To the contrary, in *Williams v. New York*, the Court held that due process is not implicated when the sentencing judge imposes death based in part on evidence of the defendant's unadjudicated offenses that were not introduced at trial and which were therefore not subject to cross-examination by the defendant. 337 U.S. 241, 250–52 (1949); *see also Nichols v. United States*, 511 U.S. 738, 747–48 (1994) (citing *Williams* and stating that "[s]entencing courts have not only taken into consideration a defendant's prior convictions, but have also considered a defendant's past criminal behavior, even if no conviction resulted from that behavior."). And,

following *Williams*, this Court has flatly held that "the admission of evidence of unadjudicated offenses at a sentencing proceeding does not violate due process." *Hatch v. Oklahoma*, 58 F.3d 1447, 1465 (10th Cir. 1995). Therefore, the OCCA did not act contrary to clearly established federal law when it determined that evidence that Mr. Boltz burglarized Mr. Kirby's home could properly be presented to the jury.

Mr. Boltz next argues that a nonviolent crime, such as the alleged burglary, is insufficient to support a finding of a probability of future criminal acts of violence. While it is true that under Oklahoma law, a nonviolent crime *standing alone* cannot be the basis for finding the continuing threat aggravator, *see Torres v. State*, 962 P.2d 3, 23 (Okla. Crim. App. 1998), neither Oklahoma nor the United States Supreme Court has ever prohibited a jury from considering the defendant's nonviolent offenses in conjunction with other factors when determining whether the defendant poses a future risk to society. Because the OCCA affirmed the jury's finding based on facts other than simply the burglary—namely, that Mr. Boltz had talked about killing people and how it did not bother him to do so, and that he had threatened to kill Ms. Kirby later on in the evening (a threat that was directly linked to his forced entry of Mr. Kirby's home)—the OCCA did not act contrary to federal law when it accounted for the burglary in its analysis of the continuing threat aggravator.

Finally, Mr. Boltz contends that allowing the continuing threat aggravator to be supported only by the callous nature of the murder violates the Eighth Amendment under clearly established law because every first-degree murder is "callous." *See Tuilaepa v. California*, 512 U.S. 967, 972 (1994) (explaining that an aggravating circumstance "must apply only to a subclass of defendants convicted of murder."); *Arave v. Creech*, 507 U.S. 463, 474 (1993) ("If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm."). We disagree.

First, and most important, Mr. Boltz mischaracterizes the OCCA opinion. It did not rest its determination on callousness alone. As that court held:

> The record reveals that appellant lured the victim to his trailer, and while he was en route, appellant called Ms. Kirby to tell her that he was going to kill Doug and threatened to kill her within the hour. There was further evidence that appellant had attempted to enter Doug's house in an attempt to find her. Other testimony revealed that appellant had bragged about killing before. These facts combined with the sheer callousness in which this murder was committed amply support the jury's finding of this aggravating circumstance.

*Boltz*, 806 P.2d at 1125. Moreover, Mr. Boltz fails to satisfy the demanding § 2254(d)(1) standard here. It is far from clearly established that every first-degree murder is callous, thereby making callousness an impermissible basis for the imposition of the death penalty. Therefore, because we cannot conclude that

the OCCA's conclusion is contrary to clearly established federal law as established by the Supreme Court or an unreasonable application of Supreme Court precedent, we must deny habeas relief on this ground as well.

2.      *Sufficiency of the Evidence*

Having determined that the OCCA did not act contrary to clearly established federal law when it relied on the foregoing evidence in considering the jury's finding of the continuing threat aggravating factor, we turn now to whether it acted contrary to clearly established federal law when it concluded that the evidence was sufficient to sustain the jury's finding. Sufficiency of the evidence claims are reviewed under the "rational fact-finder" standard announced in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), and require appellate courts to determine, after reviewing the evidence presented at trial in the light most favorable to the government, whether any rational trier of fact could have found the aggravating circumstance existed beyond a reasonable doubt. This standard is based on our system's longstanding principle that it is the province of the jury to evaluate the evidence and to draw reasonable inferences from trial testimony. *Jackson*, 443 U.S. at 319. Our review under *Jackson* is "sharply limited, and a court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must

defer to that resolution." *Turrentine*, 390 F.3d at 1197 (quotations and alterations omitted). We must accept the jury's determination as long as it is within the bounds of reason. *Messer v. Roberts*, 74 F.3d 1009, 1013 (10th Cir. 1996). Our review is even more limited given that AEDPA governs this issue. *See* 28 U.S.C. § 2254(d)(1).

In this case, evidence of Mr. Boltz's comments to Mr. Morrison about killing people and cutting off their heads, in conjunction with Mr. Boltz's threat to Ms. Kirby that he would kill her after he finished killing her son, and evidence that Mr. Boltz entered Mr. Kirby's home looking for Ms. Kirby after the killing, is more than sufficient for a rational factfinder to find that there was a probability that Mr. Boltz would commit criminal acts of violence that would constitute a continuing threat to society. Mr. Boltz contends that these statements were only "false braggadocio." He points out that he had no prior criminal record at the time and many character witnesses testified that he was a peaceful and law-abiding citizen. Even if Mr. Boltz's implied threats were empty, however, a rational juror could conclude that he was telling the truth and was threatening similar action in the future. This is all that is necessary under *Jackson*, and Mr. Boltz's argument that he had not in fact killed anyone in Korea does not prevent the jury from coming to its own reasonable conclusion about Mr. Boltz's intent in making the statements. Therefore, the OCCA did not act contrary to *Jackson* or

other clearly established federal law in upholding the jury's finding of this aggravating circumstance. Accordingly, habeas relief is not warranted on this issue.

## IV. FAILURE TO INSTRUCT ON LESSER INCLUDED OFFENSE OF HEAT OF PASSION MANSLAUGHTER

Mr. Boltz's final basis for relief is that the trial court should have instructed the jury on the offense of heat of passion manslaughter.[7] The OCCA rejected this argument because it found that the evidence at trial did not support such an instruction.

### A.    Standard of Review

Because the OCCA decided this issue on the merits, AEDPA applies. Therefore, as discussed above, we will not reverse the OCCA's determination unless it was contrary to clearly established federal law or was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1)–(2). Again, this Court has not decided whether a question concerning the sufficiency of the evidence to support the giving of a lesser included offense instruction is a matter of law or fact, and therefore reviewable under § 2254(d)(1) or § 2254(d)(2). *See,*

---

[7]Under Oklahoma law, there are three types of first-degree manslaughter: heat of passion manslaughter, manslaughter while committing a misdemeanor, and manslaughter while resisting an attempt by the person killed to commit a crime. *See* Okla. Stat. Ann. tit. 21, § 711. The trial judge ultimately instructed on manslaughter while resisting an attempt by the person killed to commit a crime—the crime ostensibly being assault.

*e.g., Turrentine*, 390 F.3d at 1197. Because we hold that the OCCA's rejection of Mr. Boltz's argument was neither contrary to federal law nor involved an unreasonable determination of the facts, we do not grant relief on this issue.

B.     Merits

First, the OCCA's legal decision to reject Mr. Boltz's claim because the evidence did not support a heat of passion manslaughter instruction was not contrary to clearly established federal law. Due process requires a judge to give a lesser included offense instruction "only when the evidence warrants such an instruction." *Hopper v. Evans*, 456 U.S. 605, 611 (1982) (emphasis omitted). Therefore, the OCCA did not err, in light of clearly established federal law, when it reasoned that the trial court must have heard evidence supporting the instruction before it could have given such an instruction.

Second, the OCCA's determination that the actual evidence at trial did not support the instruction was not based on an unreasonable determination of the facts. Heat of passion manslaughter is defined, in part, as a homicide "perpetrated without design to effect death." Okla. Stat. Ann. tit. 21, § 711(2); *see also Walker v. State*, 723 P.2d 273, 283–84 (Okla. Crim. App. 1986). Under Oklahoma law, a "design to effect death" means "an intent to kill." *Walker v. Gibson*, 228 F.3d 1217, 1238 (10th Cir. 2000) *abrogated on other grounds by Neill v. Gibson*, 278 F.3d 1044, 1057 n.5 (10th Cir. 2001) (en banc footnote);

*Smith v. State*, 932 P.2d 521, 532–33 (Okla. Crim. App. 1996). In support of its determination that the evidence did not warrant a heat of passion instruction, the OCCA found that "the evidence clearly showed [Mr. Boltz] had a design to effect death." *Boltz*, 806 P.2d at 1124.

Although the OCCA did not state the facts on which it relied in making this specific determination, based on our review of the evidence at trial, the OCCA could conclude that Mr. Boltz lured Mr. Kirby to his home, after which he phoned Ms. Kirby and told her that he was going to decapitate her son, and then did so after stabbing him multiple times. Indeed, the OCCA found these same facts in relation to Mr. Boltz's argument concerning the continuing threat aggravating circumstance that we analyzed above. *See Boltz*, 806 P.2d at 1125. We conclude that the OCCA's finding that Mr. Boltz clearly intended to kill Mr. Kirby is an entirely reasonable determination of the facts—even in light of Mr. Boltz's testimony that he was not in a rational frame of mind on the night of the killing and had a prior history as a law-abiding citizen—and is more than sufficient to support the OCCA's finding that the evidence did not support giving a heat of passion instruction. *See also United States v. Chapman*, 615 F.2d 1294, 1298 (10th Cir. 1980) (quoting *Keeble v. United States*, 412 U.S. 205, 208 (1973), and holding that a lesser included instruction must be given only "'if the evidence would permit a jury rationally to find [the defendant] guilty of the lesser offense

and acquit him of the greater.'").  Therefore, under the highly deferential standard of review set forth in both § 2254(d)(1) and § 2254(d)(2), we hold that the OCCA's determination that the evidence did not support a heat of passion instruction was not unreasonable in light of the law or the facts.  Habeas relief on this issue is denied.

## V.  CONCLUSION

Mr. Miller's performance at both the guilt and sentencing phases of Mr. Boltz's trial does not cause us to question either the jury's verdict or its decision to impose the death penalty; therefore, habeas relief based on Mr. Boltz's claim of ineffective assistance of counsel is not warranted.  In addition, the OCCA did not act contrary to clearly established federal law or base its decision on an unreasonable determination of the facts when it concluded that the evidence supported the jury's finding of the continuing threat aggravating circumstance and when it concluded that Mr. Boltz was not entitled to an instruction on heat of passion voluntary manslaughter.  Accordingly, we AFFIRM the District Court's denial of Mr. Boltz's habeas petition.